IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| ASHRAF NAGM, M.D.,<br>　　　　*Plaintiff(s)* | }<br>}<br>} |
| v. | } CIVIL ACTION NO. H-04-2132 |
| UNIVERSITY OF TEXAS HEALTH<br>SCIENCE CENTER AT HOUSTON, *et al.*<br>　　　　*Defendant(s)* | }<br>}<br>}<br>} |

## MEMORANDUM OPINION AND ORDER GRANTING MOTIONS TO DISMISS

Pending before the Court are Plaintiff's motion for temporary injunction hearing (Doc. 8), Defendants' motion to dismiss on the basis of Eleventh Amendment immunity (Doc. 12), Plaintiff's application for preliminary injunction (Docs. 19), and motions to dismiss Plaintiff's first amended complaint by Defendants The University of Texas Health Science Center at Houston and The University of Texas Medical Foundation (Doc. 24) and by Defendants Drs. John Sparks and Patricia Butler (Doc. 29).  For the reasons set forth below, the Court **ORDERS** that (1) Plaintiff's motion for temporary injunction hearing and application for preliminary injunction are **DENIED**; (2) Defendants' motion to dismiss on the basis of Eleventh Amendment immunity is **DENIED**; and (3) the motions to dismiss the first amended complaint are **GRANTED**.  Plaintiff's claims are dismissed with prejudice, and final judgment is entered in favor of Defendants.

**I.     BACKGROUND AND RELEVANT FACTS**

Plaintiff Dr. Ashraf Nagm ("Nagm") is a physician who resides in Harris County, Texas. Defendants The University of Texas Health Science Center at Houston ("UTHSC") and The University of Texas Medical Foundation (the "Foundation") are both agencies of the state of Texas with offices in Houston.  The Foundation serves as UTHSC's administrator.  Dr. John Sparks ("Sparks") is the chairman of the pediatrics department at UTHSC and, according to Plaintiff, is also the director of the residency training program at issue in this case.  Plaintiff has provided no relevant information as to the position held by Defendant Dr. Patricia Butler ("Butler").

In March 2003 Plaintiff accepted the Foundation's offer of a position as a seventh year Resident Physician in UTHSC's Interventional Pediatric Cardiology Residency Training Program

(the "Residency Training Program").[1] The parties' Appointment Agreement provided that Nagm's position was effective from 01 July 2003 to 30 June 2004, and specifically provided that the "general conditions of appointment" were to be governed by the attached General Medical Education Trainee Handbook (the "Handbook").[2] On 25 February 2004, Sparks, writing as chairman of the pediatrics department at UTHSC, sent a letter to Nagm informing him of the department's intention to request his immediate dismissal from the Residency Training Program. The letter states that "[t]his decision has been reached on the basis of repeated episodes of unacceptable conduct."[3] In particular, in September 2003 Nagm was "formally counseled regarding [his] conduct in the Catheterization Lab....primarily involving [his] behavior towards the cardiac catheterization lab staff, [his] ability to maintain good working relationships with hospital personnel, and some technical issues regarding [his] technique during cardiac catheterization."[4] The letter notes, and Plaintiff does not dispute, that Nagm was "informed that [his] conduct was unacceptable, and [was] counseled to address the issues raised."[5]

> The letter then highlights another incident in which Nagm was involved:
>
> I have now received copies of formal communication from the Committee for the Protection of Human Subjects regarding your conduct in a catheterization in January 2004. Based on the Committee's extensive evaluation of the circumstances, they imposed sanctions on you, and on two of the faculty involved in the case. Specifically, this letter disqualified you from participation in any research involving human subjects for at least one year[,] *effectively disbarring you from research during the remainder of your fellowship.* The Committee concluded that your personal conduct during the case was sufficiently egregious to warrant your personal disqualification from research.[6]

Although Plaintiff's claims against the Defendants in this action are all premised on the notion that he was dismissed from the residency program because of disciplinary reasons and not academic

---

[1]*First Amended Complaint* (Doc. 19) ¶ 7. *See also* the parties' "Appointment Agreement," attached as Exhibit A to the complaint.

[2]Both the Appointment Agreement and the Handbook are attached as Exhibit A to the *First Amended Complaint* (Doc. 19).

[3]Doc. 19 Ex. B.

[4]*Id.*

[5]*Id.*

[6]*Id.* (emphasis added).

2

reasons, Plaintiff is *not* challenging any findings made or actions taken by the Committee for the Protection of Human Subjects: the Committee is not a party to this suit, no member of the Committee is a party to this suit, and Plaintiff, as discussed below, has challenged only actions taken by UTHSC and the Foundation. After receiving Sparks's "intent to dismiss" letter, Plaintiff requested a review of Sparks's decision to dismiss him[7] and retained counsel. Plaintiff's counsel began corresponding with UTHSC administrators regarding Plaintiff's dismissal, and on 16 April 2004 Anne Brunson ("Brunson"), a senior legal officer at UTHSC, sent Plaintiff's counsel a letter regarding UTHSC's "position . . . with regard to the status of your client."[8] The letter stated the following:

> As you may be aware, the performance of Dr. Nagm in the fellowship and related developments (termination or suspension of clinical and research fellowship resources available to Dr. Nagm) led the Pediatrics Department Chairman to request his immediate dismissal from the program . . . . Our review of the overall circumstances indicates that Dr. Nagm's removal from the program is or will be justified on any one of three (3) separate sets of grounds: (1) a substantial change in circumstances of the fellowship program (described above) that make it impossible for him to continue in the program, (2) his academic performance history, and (3) his role in an alleged incident (which he denies and with which he has not been formally charged) that *may* lead to [] formal disciplinary charges . . . . [A]n independent investigation into the situation that *could* lead to disciplinary charges *has not yet reached any determination(s) or conclusion(s) relating to Dr. Nagm*.
>
> Dr. Nagm's current paid suspension from the program is based, at this time, upon the first and second bases.[9]

Pursuant to the terms of the Handbook, corrective action taken against medical residents is divided into two categories, "Academic" and "Other/Additional Corrective Actions," with each category having an associated appeal process. With respect to Academic Corrective Action, the Handbook states the following:

> In the event a Resident Physician encounters difficulty meeting and/or maintaining performance standards (academic difficulty), the Resident Physician should seek out the advice and guidance of the Program Director. Likewise, if the Program Director knows that a Resident Physician's performance is unsatisfactory, he or she must

---

[7] Although Sparks's letter spoke of an "intention" to request Plaintiff's dismissal from the residency program, both Plaintiff and Defendants treat Sparks's letter as effectively marking the beginning of Plaintiff's dismissal. It appears that on or about the date the letter was sent, Nagm was placed on a paid suspension, and that Nagm's pay and benefits were terminated on 30 June 2004. Doc. 19 Ex. C.

[8] Doc. 19 Ex. C.

[9] *Id*. (emphasis added).

3

>contact the Resident Physician and provide adequate verbal and/or written notice and guidance to the Resident Physician about his or her performance and possible corrective action....
>
>If the Program Director has notified the Resident Physician about his or her unsatisfactory performance, offered advice and guidance, and, if appropriate, corrective action, and the Resident Physician continues his or her unsatisfactory performance, it is the prerogative of the Program Director to take what he or she considers to be appropriate academic corrective action.  Corrective action may include, but is not limited to: remedial assignments, probation (formal or informal), suspension, non-reappointment to, or dismissal from the Program.
>
>Under any circumstances in which the Program Director determines that the unsatisfactory performance of the Resident Physician may constitute a threat to patient safety, he or she may immediately suspend or reassign the Resident Physician pending a final decision by the Program Director regarding the ability of the Resident Physician to continue in the Program.
>
>The PRC [Policy Review Committee], or a subcommittee of the PRC, is available to the Resident Physician to review those instances of non-reappointment, suspension or dismissal in which the Resident Physician believes that this academic corrective action was levied against him or her without the requisite notice and guidance of the Program Director.  The review by the PRC or a subcommittee of the PRC is restricted solely to the determination of whether the requisite notice and guidance was received by the Resident Physician....[10]

Because these provisions fall under section II.P.1 of the Handbook, a Resident Physician's appeal of an Academic Corrective Action is known as a "P1 Appeal." With respect to Other/Additional Corrective Actions, the Handbook states, in part, the following:

>In the event allegations of scholastic dishonesty, theft, or allegations of conduct that is prohibited by UTHSC-H, The University of Texas System, or by federal, state, or local law, are levied against a Resident Physician, the Foundation may seek to terminate the appointment of the Resident Physician prior to the end of the appointment term.  In any event in which it is determined that a Resident Physician constitutes a threat to patient safety, the Resident Physician may be immediately suspended or reassigned pending an inquiry by the Program Director.
>
>If allegations are levied against the Resident Physician that may be subject to such action, the Program Director will conduct an investigation into the allegations. If the investigation reveals that the allegations appear to be substantiated, notice of the allegations will be sent to the Resident Physician *via* certified mail....[11]

If a Resident Physician challenges a corrective action taken under this section, he is entitled to greater procedural rights than under the Academic Corrective Actions section of the Handbook. Among other things, the Resident Physician is entitled to have an Arbitration Committee appointed

---

[10] Handbook § II.P.1.

[11] *Id.* § II.P.2.

4

to review his case, and at the hearing of the allegations the UTHSC representative has the burden of proof.[12] Because these provisions fall under section II.P.2 of the Handbook, a Resident Physician's appeal of an Other/Additional Corrective Action is known as a "P2 Appeal."

Nagm sought a P2 Appeal but his request was denied. As indicated above, UTHSC took the position that Nagm's dismissal was academic.[13] Accordingly, UTHSC offered to provide Nagm a P1 Appeal. In particular, on 18 May 2004, UTHSC notified Nagm by letter that it would convene a three-member subcommittee of the PRC to review his case.[14] The letter informed Nagm that he would be allowed to challenge the impartiality of any of the proposed subcommittee members, and it described the review procedures as follows:

> The Subcommittee will meet . . . to review all presented information regarding your dismissal from the Program. The charge to the Subcommittee is to review your file and reach a determination about whether an academic dismissal is justified. You should be prepared to discuss or present any information or witnesses to support your position and you should expect your fellowship program records, if any, to be available for review by the Subcommittee. Enclosed are copies of documents that will be provided to the Subcommittee when they convene (unless you object). If you have documents that you would like the Subcommittee to consider please send them to me for review by Dr. Sparks and possible distribution to the Subcommittee (unless he objects). Objections, if any, will be discussed and decided by the Subcommittee at the review . . . . Neither party will be allowed to have an attorney in the meeting room; however, you may leave the room as needed, within reason, to consult with your attorney if you wish.[15]

On 28 May 2004, Nagm filed suit in state court against UTHSC and the Foundation, seeking to obtain an injunction requiring Defendants to grant him a P2 Appeal. In addition, Nagm's complaint asserted claims against both those Defendants for breach of contract and for violation of his substantive and procedural due process rights, both federal and state, and sought "actual damages, reasonable and necessary attorneys' fees, pre and post judgment interest, punitive damages, [and] court costs," in addition to injunctive relief.[16] On that same day the state court heard and granted

---

[12]*Id.*

[13]Letter from Anne Brunson (UTHSC's senior legal officer) to Bennett Fisher (Plaintiff's counsel) dated 16 April 2004 (Doc. 19 Ex. C).

[14]Letter from Patricia Butler (UTHSC's Associate Dean for Educational Programs) to Ashraf Nagm, dated 18 May 2004 (Doc. 19 Ex. E).

[15]*Id.*

[16]*Plaintiff's Original Petition* (Doc. 1 Ex. 2) ¶¶ 10-11.

Nagm's application for a temporary restraining order, prohibiting Defendants from going forward with the scheduled P1 Appeal.[17] On 04 June 2004, Defendants removed this action to this Court, asserting that "Plaintiff's allegations regarding violations of the United States Constitution raise a federal question" and specifically stating that "Defendants pray that this cause be removed to the United States District Court for the Southern District of Texas, Houston Division, pursuant to § 1441 of Title 28 of the United States Code."[18] On 31 August 2004, Nagm filed a motion for a temporary injunction hearing in this Court. On 08 September 2004, this Court entered an Order requiring the parties to brief the issue of "the propriety of this Court's exercising jurisdiction over this action."[19] Both parties have filed their briefs. In addition, Defendants have filed a motion to dismiss this action "based on Eleventh Amendment immunity."[20] Defendants' motion to dismiss also asserts that because they are agencies of the state of Texas they are not "persons" under 42 U.S.C. § 1983 and thus "Plaintiff's claims for violations of due process must be dismissed because this Court does not have jurisdiction over the Defendants."[21] On 08 October 2004 Plaintiff filed his first amended complaint, asserting the same causes of action as in his original petition but adding Drs. John Sparks and Patricia Butler as defendants. All four plaintiffs subsequently filed motions to dismiss. Plaintiff has replied and the motions are ripe for ruling.

## II. ANALYSIS

### A. Identifying Plaintiff's Claims

The first task in this case is to identify what claims, exactly, Plaintiff is actually asserting. In responding to UTHSC and the Foundation's motion to dismiss, Plaintiff states that "a large part of Defendants' Motion to Dismiss is misplaced as Defendants are seeking dismissal on claims that have not been made by Nagm."[22] If, however, any part of Defendants' arguments were misplaced,

---

[17]*Temporary Restraining Order* (Doc. 1 Ex. 3).

[18]*Notice of Removal* (Doc. 1) at 2.

[19]Doc. 10.

[20]*Motion to Dismiss* (Doc. 12) at 1.

[21]*Id.* at 4.

[22]Doc. 30 at 1.

6

the fault was entirely Plaintiff's. Plaintiff's first amended complaint states in no uncertain terms that "Defendants have violated Nagm's state and federal due process rights both substantively and procedurally, for which Nagm seeks injunctive and monetary relief....Plaintiff seeks its actual damages, reasonable and necessary attorneys' fees, pre and post judgment interest, punitive damages, court costs and injunctive relief."[23] Plaintiff's failure to state his claims accurately and to edit out what was apparently meaningless boilerplate in his complaint has wasted time and effort on the part of both Defendants and this Court. Neither Defendants nor this Court should have to parse through Plaintiff's responses to the motions to dismiss to discover what Plaintiff was actually alleging.

Nevertheless, having read the motions to dismiss and Plaintiff's responses, it now appears that Plaintiff is seeking only prospective injunctive relief in this action, and is not seeking damages from any of the Defendants. Specifically, it appears that the only claims Plaintiff is asserting are these: (1) a claim for injunctive relief against UTHSC and the Foundation for violation of his due process rights under the Texas Constitution; and (2) a claim for injunctive relief against Drs. Butler and Sparks for violation of his federal due process rights. To the extent Plaintiff is asserting any other claims the Court **ORDERS** that those claims are **DISMISSED** for failure to state a claim. Specifically, Plaintiff's claims against UTHSC and the Foundation for federal constitutional violations, which is to say his claims against these Defendants under 42 U.S.C. § 1983, are dismissed for failure to state a claim. There is no dispute that UTHSC and the Foundation are agencies of the state of Texas.[24] Accordingly, neither of those Defendants is a "person" within the meaning of § 1983, and Nagm has failed to properly state any federal claim against them.[25]

---

[23]Doc. 19 ¶ 12.

[24]*See* Tex. Educ. Code § 65.02(9) (establishing that UTHSC is a part of the University of Texas System); *and Smith v. University of Texas Health Science Center at Houston*, Civil Action No. 01-1475 (S.D. Tex.), Order of 30 October 2002 at 24 (holding that UTHSC is a state agency for Eleventh Amendment purposes), *aff'd* 100 Fed.Appx. 980 (5th Cir. 2004); *see also Siler-Khodr v. University of Texas Health Science Center at San Antonio*, 261 F.3d 542 (5th Cir. 2001) (treating other UT Health Science Center as arm of the state for Eleventh Amendment purposes). The Court finds that the Foundation, as the administrator of UTHSC's "Affiliated Hospitals Integrated Residency Training Program," is likewise a state agency for § 1983 and Eleventh Amendment purposes.

[25]*Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 (1989) ("neither a State nor its officials acting in their official capacities are 'persons' under § 1983"); *Cronen v. Texas Dept. of Human Services*, 977 F.2d 934, 936 (5th Cir. 1992) ("The state and the agency properly argue that they are not 'persons' for purposes of liability under 42 U.S.C. § 1983").

The Court also finds that Plaintiff has failed to state a claim for breach of contract. As an initial matter, the Court notes that, after reading Plaintiff's responses to the motions to dismiss, it appeared to the Court that Plaintiff was no longer asserting his claim for breach of contract, but was only asserting claims for injunctive relief premised on state and federal constitutional violations. However, to the extent Plaintiff did intend to maintain his breach of contract claim, the claim is dismissed because Plaintiff has failed to address in any way Defendants' argument that, under Texas law, "a private citizen must have legislative consent to sue the State on a breach of contract claim."[26] Although, as discussed below, the Court finds that the state agencies in this action waived their sovereign immunity to be sued in a federal forum (*i.e.*, what might be called "forum immunity") when they removed this action and affirmatively invoked this Court's jurisdiction, the Court disagrees with the notion that a state's or state agency's removal of an action to federal court constitutes a waiver of all aspects of its sovereign immunity. Specifically, this Court will not hold, particularly when Plaintiff has failed to directly address the issue, that the state agencies' removal of this action could somehow change the requirement under Texas state law that there must be "*legislative* consent to sue the State on a breach of contract claim."[27] Under these circumstances, the Court finds that the holding in *Lapides v. Board of Regents of University System of Georgia*, 535 U.S. 613 (2002), does not apply.[28]

**B.    No Jurisdictional or Prudential Bars to Plaintiff's Remaining Claims**

The Court has federal question and supplemental jurisdiction over Plaintiff's remaining claims. Defendants, however, raise two further objections to this Court's proceeding to the merits of Plaintiff's claims: (1) UTHSC and the Foundation argue that Plaintiff's state law constitutional claim for injunctive relief against them must be dismissed because, as state agencies, they possess

---

[26]*Federal Sign v. Texas Southern University,* 951 S.W.2d 401, 408 (Tex.1997).

[27]*Id.* (emphasis added).

[28]Although it contained generally-worded *dicta*, the Supreme Court's holding in *Lapides* was explicitly limited "to the context of state-law claims, in respect to which the State has explicitly waived immunity from state-court proceedings." 535 U.S. at 617. Thus, while *Lapides* applied to the plaintiff's breach of contract claim in a case like *Estes v. Wyo. Dep't of Transp.,* 302 F.3d 1200 (10th Cir.2002), because the state of Wyoming had by statute waived its "sovereign immunity for contract-claim suits in its own courts," there was no such waiver here. On the contrary, Texas requires *legislative* consent to sue the state on a breach of contract claim, and thus this case presents a situation, explicitly *not* addressed by the Court in *Lapides*, "where the State's underlying sovereign immunity from suit has not been waived or abrogated in state court." *Id.* at 618.

8

sovereign immunity with respect to these claims and because, under Texas law, state agencies cannot be sued for state constitutional violations; and (2) all Defendants argue that Plaintiff's claim are not yet ripe for adjudication.[29]

With respect to the first objection, the parties dispute whether Plaintiff could bring his claims against UTHSC and the Foundation in state court. Defendants argue that a "plaintiff in state court seeking equitable relief based on violations of constitutional rights must name a state official," and cannot directly sue a governmental entity.[30] Accordingly, UTHSC and the Foundation "request dismissal of all claims against them because of Eleventh Amendment immunity and sovereign immunity."[31] Plaintiff, however, contends that, at least since *City of Beaumont v. Bouillion*, 896 S.W.2d 143 (Tex. 1995), Defendants' position is no longer the law in Texas, and that he would be entitled to bring a claim directly against UTHSC and the Foundation for injunctive relief in state court. The Court agrees with Plaintiff. As one state appellate court recently stated, *Bouillion* established that "aggrieved persons may assert direct claims for *equitable* relief against governmental entities for violations of the Texas Bill of Rights."[32] Accordingly, since Plaintiff could have maintained this action in state court, the Court finds that the holding in *Lapides* applies and UTHSC and the Foundation waived any claims to sovereign immunity to suit in a federal forum.

With respect to the second objection, Defendants argue that Plaintiffs' claims are not ripe because the appeals process has not yet run its course and, therefore, it is premature for Plaintiff to argue that the appeal offered by Defendants (*i.e.*, a P1 appeal) violates his state or federal constitutional rights. Plaintiff contends that his claim is ripe because it is precisely the fact that he

---

[29]Defendants do not appear to have any further objection to this Court's reaching the merits of Plaintiff's claim for injunctive relief against Butler and Sparks. In any case, it is clear that "a party may sue to have a federal court order state officials to conform their future conduct to the requirements of federal law." *Mangaroo v. Nelson*, 864 F.2d 1202, 1208 (5th Cir. 1989) (*citing Ex parte Young*, 209 U.S. 123 (1908)). Furthermore, with respect to such claims for injunctive relief, the issue of qualified immunity, which applies only to claims for damages, is irrelevant. *Id.*

[30]Doc. 24 at 6.

[31]*Id.* at 7.

[32]*Texas Tech University Health Science Center v. Rao*, 105 S.W.3d 763, 767 (Tex.App.–Amarillo 2003, pet. denied).

is being given a P1 appeal and not a P2 appeal that he is challenging. Furthermore, apparently conceding that he will not be able to prevail at a P1 appeal, Plaintiff claims that he will be irreparably injured if he does not receive a P2 appeal and asserts that "no relevant facts" which are needed for the Court to rule on Plaintiff's claims are in dispute.[33]

Ripeness is "a constitutional prerequisite to the exercise of jurisdiction."[34] The Fifth Circuit has described the standard for determining whether a dispute is ripe for adjudication as follows:

> A court should dismiss a case for lack of "ripeness" when the case is abstract or hypothetical. The key considerations are "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required.[35]

The Court finds that Plaintiff's claim is ripe for adjudication. Although, as Defendants argue, additional facts would undoubtedly be developed if the P1 appeal went forward, Defendants have not shown that any of these facts are both presently unknown and essential to the issues before this Court. On the contrary, Defendants apparently agree with Plaintiff that there is no dispute as to the precise procedures he would be afforded in a P1 appeal.[36] Furthermore, Plaintiff has attached his appointment agreement, a copy of the Handbook, and several letters to his complaint, all of which document the events immediately leading up to Plaintiff's dismissal from the residency program and the appellate procedures he was being offered by Defendants.[37] None of the essential facts thus documented are in dispute. Finally, the Court notes that Plaintiff contends without opposition that he "cannot seek employment, and may be forced to leave the country, because of Defendants' refusal to grant him an opportunity to challenge the basis for his dismissal."[38] Accordingly, the

---

[33] Doc. 15 at 5 n.5.

[34] *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148-49 (1967).

[35] *Orix Credit Alliance, Inc. v. Wolfe*, 212 F.3d 891, 895 (5th Cir. 2000) (quoting *Abbott Laboratories*, 387 U.S. at 149).

[36] *Defendants' Response Brief on Federal Jurisdiction and on Merits of Plaintiff's Claims* (Doc. 13) at 12 ("The hearing offered to Plaintiff here provides all of the attributes of the hearing provided in *Davis* [*v. Mann*, 882 F.2d 967, 974 (5th Cir. 1989)].").

[37] Doc. 19 Exs. A-F.

[38] Doc. 15 at 6. Plaintiff apparently is not a U.S. citizen. Defendants have not raised any issues related to Plaintiff's citizenship in their motions.

Court finds that (1) the issues in this case are ripe for judicial decision, and that, (2) in light of Plaintiff's uncertain residency status in this country and in light of the fact that he is at the end of his medical residency and thus in a unique position of searching for employment, withholding judicial review would work a particular hardship on Plaintiff. The Court concludes that Plaintiff's claims present an actual controversy that is ripe for adjudication.

**C.     Plaintiff Is Not Entitled to a P2 Appeal**

After carefully reviewing the record in this case, including the allegations in Plaintiff's complaint and the facts presented in the exhibits attached thereto,[39] the Court concludes that (1) Defendants provided and offered to provide Plaintiff with process that was sufficient under both the state and federal constitutions, (2) Defendants were not required to provide Plaintiff with a P2 appeal, and (3) Plaintiff's action should be dismissed with prejudice.

   *1.     Due Process Rights of Medical Residents*

The Fifth Circuit recently addressed the due process rights of medical residents in *Shaboon v. Duncan*, 252 F.2d 722 (5th Cir. 2001). Shaboon was a medical resident at the University of Texas Health Science Center at San Antonio. In her particular program, the residents signed a memorandum of understanding with the hospitals stating that "under no circumstances will either Party terminate this agreement prior to its expiration date without prior notice and without providing the other party the opportunity to discuss freely any differences, dissatisfactions, or grievances that may exist."[40] Shaboon, who was diagnosed as "suffering from major depression," was eventually terminated from the residency program. Prior to her termination Shaboon and her attorney met with Dr. Charles Duncan, the residency program director, and Jack Park, the Hospital District's executive director of institutional services, to discuss the options available to her in light of the difficulties she was having in the program. Shortly after this meeting, an "intent to dismiss" letter was sent to Shaboon. The letter cited her "failure to satisfy academic requirements," and noted that the

---

[39]The court may consider the facts presented in exhibits to the complaint, as well as the factual allegations of the complaint itself. *See Zinermon v. Burch,* 494 U.S. 113, 118(1990); *Caine v. Hardy,* 943 F.2d 1406, 1411 n. 5 (5th Cir.1991); *see also* Fed. R. Civ. ¶.10(c)("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."). However, "[t]he court will not accept as true allegations that are contradicted ... by other allegations or by exhibits attached to or incorporated in the pleading." 5A Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE § 1363.

[40]*Shaboon*, 252 F.3d at 724.

11

"deficiencies you have demonstrated regarding your ability to care for patients and your refusal to cooperate with our efforts to help you have caused you to fail three months of your training."[41] The letter concluded, "[i]f you can provide any evidence or reason to us as to why you should not be dismissed from the program, then we will consider that information prior to final dismissal procedures."[42] Shaboon failed to timely respond to this letter, and when she subsequently untimely sought an appeal her request was denied. Shaboon filed suit shortly thereafter, "alleging a wide variety of claims against virtually every person involved in these events."[43]

In analyzing Shaboon's federal due process claims against Duncan, the Fifth Circuit rested its analysis primarily on *Goss v. Lopez,* 419 U.S. 565 (1975), *Board of Curators of University of Missouri v. Horowitz,* 435 U.S. 78 (1978), and *Davis v. Mann,* 882 F.2d 967 (5th Cir.1989). In light of these cases, the court considered it well established that "the primary purpose of a residency program is not employment or a stipend, but the academic training and academic certification for successful completion of the program."[44] Furthermore, the *Shaboon* court concluded that a medical resident "receive[s] all that the Fourteenth Amendment requires where the school fully inform[s] her of the faculty's dissatisfaction with her clinical progress and the danger that this pose[s] to timely graduation and continued enrollment."[45] Accordingly, the *Shaboon* court provided the following summary of *Davis*, which involved a dental resident's due process challenge to his academic dismissal:

> Citing both *Horowitz* and *Goss, Davis* observed that "[c]ourts overwhelmingly agree that students, whether dismissed for academic or disciplinary reasons, are not entitled to as much procedural protection under the Fourteenth Amendment as employees who are terminated from their jobs." And, pursuant to *Horowitz,* "Davis was not entitled to any hearing–much less the full-blown post-termination hearing he received." The student received ample notice of the charges against him and a warning of the consequences that would follow his failure to improve performance.[46]

---

[41]*Id.* at 727.

[42]*Id.*

[43]*Id.* at 728.

[44]*Id.* at 729 (quoting *Davis*, 882 F.2d at 974).

[45]*Id.* at 730 (internal quotations omitted).

[46]*Id.* (internal citations omitted).

12

Relying on these precedents, the *Shaboon* court readily concluded that Shaboon had received sufficient process. Although the court held, as discussed below, that Shaboon's dismissal was academic, the court nevertheless specifically concluded that Shaboon had received sufficient process even if her dismissal had been purely disciplinary:

> Shaboon was informed that her residency was in jeopardy and of her deficient performance. She had several opportunities to comply with the official requests for a review of her psychiatric records and to explain why she should not be dismissed. She was allowed to have her attorney represent her in a meeting with Duncan and Park. Thus, Shaboon received sufficient process as a matter of law even if her dismissal was disciplinary.[47]

### 2. *Plaintiff's Dismissal Was Academic*

Plaintiff's primary contention in this case is that Defendants' claim that he was dismissed for academic reasons is specious. In Plaintiff's view, his dismissal was clearly disciplinary, and he is therefore entitled to a P2 appeal, pursuant to the Handbook. Thus, Plaintiff has from the beginning of his dispute with Defendants focused his attention on the third of the three possible reasons for his dismissal stated in the letter sent to his counsel by Anne Brunson, UTHSC's senior legal officer.[48] Although neither party has directly addressed what, exactly, occurred during this alleged incident, Nagm has stated the following: "While Defendants have not explicitly stated so, and have left their allegations vague, it is Nagm's understanding that Defendants' basis for dismissal was due to an unsubstantiated allegation that medical records were altered by Nagm, a charge (if made) Nagm vehemently denies."[49]

Nagm's focus on this alleged incident of misconduct is misguided. The very documents he attached to his first amended complaint conclusively establish that Defendants had an academic basis for his dismissal. Although Sparks's "intent to dismiss" letter references "repeated episodes of unacceptable conduct," the letter also highlights a key fact in this case, a fact which Nagm does not dispute and has consistently neglected to address: whatever the nature of the alleged incident of misconduct, as a result of that conduct Nagm was "disqualified . . . from participation in any

---

[47]*Id.* at 731.

[48]Doc. 19 Ex. C.

[49]Doc.15 at 11.

13

research involving human subjects for at least one year" by the Committee for the Protection of Human Subjects.[50] As noted above, Nagm has not challenged the Committee's findings or its sanctions on him, nor is the Committee itself or any of its members a party to this suit. Thus, the record in this case indisputably establishes that at the time of his dismissal Nagm stood before Sparks and UTHSC as a medical resident who could no longer conduct research on human subjects. The record establishes that it was primarily on *this* independent basis that Defendants dismissed Plaintiff, even though they may have been aware of other possible reasons for his dismissal. Both Brunson's and Sparks's letters make this clear. Brunson, writing to Nagm's counsel for the express purpose of informing him of the program's reasons for Nagm's dismissal, stated the following:

> As you may be aware, the performance of Dr. Nagm in the fellowship and related developments (*termination or suspension of clinical and research fellowship resources available to Dr. Nagm*) led the Pediatrics Department Chairman to request his immediate dismissal from the program . . . . Our review of the overall circumstances indicates that Dr. Nagm's removal from the program is or will be justified on any one of three (3) separate sets of grounds: (1) *a substantial change in circumstances of the fellowship program (described above) that make it impossible for him to continue in the program*, (2) his academic performance history, and (3) his role in an alleged incident (which he denies and with which he has not been formally charged) that *may* lead to [] formal disciplinary charges . . . . [A]n independent investigation into the situation that *could* lead to disciplinary charges *has not yet reached any determination(s) or conclusion(s) relating to Dr. Nagm.*
>
> Dr. Nagm's current paid suspension from the program is based, at this time, upon the first and second bases.[51]

Thus, Brunson's letter clearly identifies Nagm's inability to engage in research, perhaps the single most important "academic" aspect of graduate education, as the primary reason for his dismissal. Sparks's letter likewise emphasized the fact that Nagm's inability to conduct research on human subjects had the effect of "disbarring [him] from research during the remainder of [his] fellowship."[52] Finally, Brunson's letter also states that Nagm had *not*, in fact, even been charged with any sort of disciplinary misconduct, and that, at the time of his dismissal, the investigation into the incident was still ongoing. Nagm has never disputed this fact.

---

[50]Doc. 19 Ex. B.

[51]Doc. 19 Ex. C (emphasis added).

[52]*Id.* Ex. B.

14

Based on these letters, which were attached to and specifically referenced in Plaintiff's complaint, the Court finds that Plaintiff's disqualification from performing research on human subjects constituted an independent basis upon which Defendants could and did dismiss him. The Court further finds that Defendants' decision to dismiss Plaintiff on this basis constituted an academic dismissal. Research is perhaps the single most important "academic" aspect of graduate education, particularly in the medical "fellowship" context. The fact that Plaintiff had rendered himself no longer capable of conducting research, for whatever reason, was a legitimate cause of concern for Defendants with respect to Plaintiff's academic prospects. Because even Nagm does not dispute that he received sufficient process if his dismissal was academic,[53] this finding alone is sufficient to merit dismissal of Nagm's action.

### 3. *Nagm Necessarily Received Sufficient Process as a Matter of Law*

Furthermore, the Court finds that, as made clear by the analysis in *Shaboon*, Nagm necessarily received sufficient process as a matter of law, even if his dismissal was disciplinary. Sparks's letter states, and Nagm does not dispute, that, on 09 September 2003, Nagm was "formally counseled" regarding his conduct in the cath lab. The letter describes this counseling as follows:

> Dr. Steve Allen, Medical Director of the Memorial Hermann Hospital, summoned you for formal counseling in the presence of Dr. Rao, Director of the Pediatric Fellowship, Ms. Phyllis Tucker, Director of Medical Staff Services, and myself. This counseling was undertaken on the basis of several issues in the Cardiac Catheterization Laboratory, primarily involving your behavior towards the cardiac catheterization lab staff, your ability to maintain good working relationships with hospital personnel, and some technical issues regarding your technique during cardiac catheterization. You were informed that your conduct was unacceptable, and you were counseled to address the issues raised.[54]

Nagm does not dispute that this formal counseling occurred. Furthermore, it was because of Nagm's "conduct in a catheterization" in January 2004 (*i.e.*, after this counseling occurred) that the Committee for the Protection of Human Subjects disqualified him from performing further research.[55] Shortly thereafter, and based on his own overall assessment of Nagm's prospects as a

---

[53] Nagm has consistently insisted that he simply wants Defendants to follow their own Handbook. Under the terms of the Handbook, a resident dismissed for academic reasons is entitled only to a P1 appeal and not to a P2 appeal.

[54] Doc. 19 Ex. B.

[55] *Id.*

15

doctor, Sparks sent Nagm his "intent to dismiss" letter. The letter specifically references "a continued pattern of conduct which is unacceptable and which was not improved after your first counseling session."[56] Finally, as mentioned in Sparks's letter, Nagm was allowed to appeal the decision to dismiss him. As Defendant Butler's letter makes clear, a three-member subcommittee of the PRC was to be convened to review his case.[57] The letter informed Nagm that he would be allowed to challenge the impartiality of any of the proposed subcommittee members; that the subcommittee would "review all presented information" regarding his dismissal; that "[t]he charge to the Subcommittee is to review your file and reach a determination about whether an academic dismissal is justified"; that he would be allowed to "discuss or present any information or witnesses to support [his] position"; that copies of documents being provided to the subcommittee were enclosed for his inspection, and he would be allowed to object to these documents; that he could submit documents of his own choosing for the subcommittee's review; and that, although neither party would be allowed to have an attorney present, he would be allowed to leave the room to consult with his attorney as necessary.[58] In this Court's view, the process afforded Nagm before his dismissal and the process offered to him thereafter was more than is required by the Fourteenth Amendment. This process was plainly at least as much process as was afforded the plaintiff in *Shaboon*. Nor does the Texas constitution require anything more.[59] Accordingly, the Court finds that, even if Nagm's dismissal was disciplinary, he received sufficient process as a matter of law. The motions to dismiss are granted.

---

[56]*Id.*

[57]Letter from Patricia Butler (UTHSC's Associate Dean for Educational Programs) to Ashraf Nagm, dated 18 May 2004 (Doc. 19 Ex. E).

[58]*Id.*

[59]*See University of Texas Medical School at Houston v. Than*, 901 S.W.2d 926, 929, 931 (Tex. 1995) (noting that the federal due process clause and Texas's "due course" clause are "without meaningful distinction" and stating, in action involving medical student dismissed in connection with allegations of academic dishonesty, that "[a]t a minimum, when university officials seek to sanction a student for misconduct, our due course of law guarantee requires oral or written notice of the charges against the student and, if the student denies them, an explanation of the evidence the authorities have and an opportunity to present his or her side of the story.").

### III. CONCLUSION

There are no jurisdictional or prudential bars to Plaintiff's claims for injunctive relief against Defendants. Nevertheless, the Court finds that Plaintiff's dismissal was academic, that Defendants therefore did comply with their own guidelines, and that even if Plaintiff's dismissal was disciplinary Plaintiff was afforded sufficient process as a matter of law. Plaintiff was not and is not entitled to a P2 appeal, or to any more process than he received and was offered. Defendants' motion to dismiss on Eleventh Amendment grounds is denied, but their motions to dismiss the first amended complaint are granted. Plaintiff's motion for temporary injunction hearing, his application for preliminary injunction, and any other pending motions are denied as moot. Plaintiff's action is dismissed with prejudice.

**SIGNED** at Houston, Texas, this 11th day of May, 2005

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE